# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 03-2308

_____

United States of America,

      Plaintiff – Appellee,

    v.

Martha Alvarado-Rivera,
also known as Rosa Ontiveros Aranda,

      Defendant – Appellant.

_____

No. 03-2374

_____

Appeals from the United States
District Court for the
District of Minnesota.

United States of America,

      Plaintiff – Appellee,

    v.

Gilberto Moya-Vega,
also known as Jorge Salinas,

      Defendant – Appellant.

_____

Submitted: June 15, 2004
Filed: October 26, 2004

_____

Before MURPHY, HEANEY, and BRIGHT, Circuit Judges.

_____

BRIGHT, Circuit Judge.

Martha Alvarado-Rivera and Gilberto Moya-Vega each appeal the district court's denial, at sentencing, of the "safety valve" provision of 18 U.S.C. § 3553(f), which would, if applicable, mandate a sentence under the federal sentencing guidelines, without respect to any mandatory minimum sentence. Appellants each pleaded guilty to conspiracy to distribute and possess with intent to distribute 500 grams or more of a substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(b)(1)(A), 846. Appellants were each subject to a mandatory minimum sentence of a term of incarceration of ten years, unless the safety valve provision applied to them. At separate sentencing hearings, the district court denied application of the safety valve to each appellant because it found that they did not, as required by the safety valve provision, provide the government a full and truthful account of their knowledge concerning the offense.[1]

_____

[1]It is undisputed that each appellant satisfied the other requirements of the safety valve. The safety valve provision of 18 U.S.C. § 3553(f) mandates a sentence under the federal sentencing guidelines, without regard to any mandatory minimum,

> if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that—
>     (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;
>     (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>     (3) the offense did not result in death or serious bodily injury to any person;
>     (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal

The court sentenced Alvarado-Rivera to 120 months and Moya-Vega to 135 months.

Because each appellant carried their burden of affirmatively demonstrating the completeness and truthfulness of their proffers, and the government made no showing to negate the completeness and truthfulness of the proffers, beyond the improbability of the accounts given, we hold that the district court clearly erred by not finding that each appellant had made the requisite proffer. Accordingly, we vacate the sentence as to each appellant and remand for resentencing pursuant to the federal sentencing guidelines without regard to any statutory minimum sentence.

I.

Alvarado-Rivera and Moya-Vega came to the attention of the authorities because of a controlled drug buy on August 13, 2002. The Ramsey County Sheriff's Office had arranged the buy through an informant. Based on his prior dealings with appellants, the informant had advised officers that Moya-Vega would be driven to the scene by his wife, Alvarado-Rivera, in a champagne-colored vehicle and that he would have three ounces of cocaine hidden in his crotch. After officers observed the car arrive as the informant had predicted, police arrested appellants and found the cocaine as described.

---

enterprise, as defined in section 408 of the Controlled Substances Act; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

Appellants, who are illegal aliens,[2] spoke little English, so police officers held them in the apartment's parking lot until a Spanish-speaking agent from the Drug Enforcement Task Force arrived to question them. The agent discerned from talking to both appellants that they were married and lived in a trailer home in Blaine, Minnesota. Alvarado-Rivera took officers to the trailer home, opened it with a key on her key ring, and consented to a search of the trailer.

Upon entry to the trailer, the officers observed that the trailer home was nearly empty, containing little more than a baby's washtub inside the bathroom. The officers doubted Alvarado-Rivera's prior statement that she and her husband lived in the trailer home. Officers questioned her about their suspicions and she insisted that she and Moya-Vega lived there together. After an initial search of the trailer, the officers did not discover any narcotics. The officers brought a narcotics dog to the trailer to conduct a more thorough search. The dog alerted officers to approximately twenty-seven pounds of methamphetamine hidden in a large paper bag behind a cupboard in the kitchen. Alvarado-Rivera denied any knowledge of the drugs found in the trailer.

The following day, while taking inventory of documents seized from Alvarado-Rivera, officers found a receipt from a management company for the rental of an apartment. The officers determined that Moya-Vega and Alvarado-Rivera rented the apartment under the aliases Jorge Salinas and Rosa Ontiveros-Aranda, and that appellants lived in that apartment. The officers obtained a warrant to search the apartment and found approximately one pound of methamphetamine hidden in the dishwasher, which bore the same distinctive appearance as that found in the trailer home, and other small amounts of cocaine and marijuana hidden throughout the

---

[2]The Immigration and Naturalization Service has lodged detainers as to each appellant with the United States Marshals Service and has advised that each appellant will be deported following their terms of incarceration.

apartment. The officers found $3,875 in cash hidden in the bedroom closet and a digital scale which could be used to measure cocaine. The officers found receipts for two wire transfers of money to individuals in Mexico–one transfer in the amount of $5,000 and one for $1,000. The officers also found notes which they suspected pertained to drug sales and which they believed to indicate wire transfers totaling approximately $99,000 to various individuals in Mexico, sent over a two-month period in the summer of 2002.

Gilberto Moya-Alvarado, one of appellants' sons, lived in an adjoining apartment. Officers spoke to him, and he consented to a search of a storage locker associated with his apartment. Officers found in the locker 281.5 grams of methamphetamine, 43.5 grams of cocaine, and 85.2 grams of marijuana. The son told the officers that he had removed the drugs from his parents' apartment at the direction of his brother, Gustavo Moya-Alvarado, after their parents failed to return home on the day of their arrest.[3] In all, appellants were responsible for 127.1 grams of cocaine, 12,147.7 grams of a substance containing methamphetamine, and 85.2 grams of marijuana.

The grand jury returned a six-count indictment against each appellant, alleging a drug conspiracy between appellants and several other drug-related offenses. On December 5, 2002, appellants each pleaded guilty to the charge of conspiracy, and the other charges were dismissed. The conspiracy charge carried a ten-year mandatory minimum sentence. After entry of the pleas, the government interviewed each

---

[3]Gustavo Moya-Alvarado was not charged in connection with this offense, and he voluntarily deported to Mexico. Gilberto Moya-Alvarado was charged with First Degree Controlled Substance Crime (Possession of Methamphetamine) and was sentenced on January 7, 2003, to serve a term of incarceration of 200 days, thereafter to be placed on probation for a term of ten years. The Immigration and Naturalization Service placed a hold on his case for deportation following his term of incarceration.

appellant separately to facilitate their attempts to qualify for the safety valve provision.

In her interview, Alvarado-Rivera stated that she and her husband had sublet the trailer home to someone else in July 2002, and that she retained a key in order to make some repairs in the trailer. (The record indicates no inquiry into the details of this alleged arrangement.) Alvarado-Rivera denied knowledge of the drugs in the trailer but admitted having known of the drugs in the apartment. She explained that she had lied about living in the trailer because she knew of the drugs in the apartment and did not want to lead the police to them. She admitted that the drugs recovered from the storage locker associated with her son's apartment had been in her and her husband's apartment, in a closet, and that her son had moved them, as he had told the police. While admitting to having known of drugs in the apartment generally, she said she had not known of the drugs recovered from the dishwasher. She explained that she is a traditional person, that she did not know how to use a dishwasher and had never used one. She said that she had never sold drugs, though she had driven her husband on some occasions on which he sold drugs. She said that the informant was the only customer she had knowledge of. She said that the only money she knew of was money she made selling food. (The record indicates no inquiry into the details of such sales.) She said that she had used the measuring scale only once, to weigh a bracelet.

The prosecutor advised the district court by letter that he believed Alvarado-Rivera had not made a complete and truthful proffer. The government identified no questions it had put to appellant which she refused to answer. Nor did the government produce any evidence contradicting any statement she had made. Nor did the government identify any internal inconsistency or contradiction in appellant's account. The prosecutor simply stated that he did not believe appellant's account was truthful and complete. The government offered to interview Alvarado-Rivera a

second time, but no second interview was conducted, because appellant said she had no additional or different information to offer.

At Alvarado-Rivera's sentencing hearing, the government added little to its simple declaration of disbelief: The government said that it would not be unusual, assuming—as there was no evidence on the point—that Alvarado-Rivera had personally sold drugs, if the government were unable to find anyone to testify to such sales. The government asserted that "two people with this quantity of drugs are obviously not the small-time dealers that they would portray themselves as." The government speculated that appellant might have led the police to the trailer, even knowing of the drugs there, thinking the drugs were too well hidden to be found. And the government noted that the methamphetamine found at the trailer was distinctive in its appearance and consistency and was similar to that found at appellants' apartment. Again the government provided no evidence contradicting any statement appellant made and identified no internal contradictions in the statements. Nor did the government even specify which statements by Alvarado-Rivera were false in the government's view. On the basis of these brief remarks, the prosecutor stated, "I just simply can't suggest to this Court that she has told the complete truth. And that's why I'm opposing the safety valve here."

The district court's consideration of appellant's statement was similarly brief. The court stated,

> There's no ring of truth to this. Everything that I see tells me that for reasons either you're scared of what's going to happen to your family or you're scared for yourself, I don't believe that you've substantially told the truth. None of this makes sense to me. Apart from going to the trailer and apart from what [the prosecutor] said, whether it's using the scale, wearing a bracelet or an informant being absolutely certain, well, I'll tell you exactly how the deal is going to go, it's going to be his wife driving the car, and apart from what the husband has said or not said, the

idea that, well, I only know of one person that we've ever sold drugs to and any money I've gotten I've gotten from selling food. None of it makes any sense the way some of these items were moved by sons. All of it points to me that you weren't substantially truthful.

. . . .

Is it possible that I've made a mistake?
Yes.
But then it's my responsibility.

Sent. Tr. at 37-38.

The court denied the safety valve and sentenced Alvarado-Rivera to serve a term of incarceration of 120 months (10 years).

The government interviewed Moya-Vega twice. He claimed that his only drug customer was the informant. Moya-Vega said he usually sold the informant a half-ounce of cocaine, and that he made from fifty to one hundred dollars per ounce in profit. (The record does not indicate appellant's gross revenue per ounce.) He said that the $3,875 in cash recovered from the bedroom closet was all from drug sales to the informant. (The record does not indicate how much of that money constituted profit.) Moya-Vega initially said he had sold drugs to the informant about fifteen times. When the government said that would not account for the drug proceeds Moya-Vega had already admitted to, appellant increased his estimate, saying he had sold to the informant two or three times a week for about six months. Moya-Vega said he had sold only cocaine, that he had recently received his first supply of methamphetamine and had intended to sell it, but had not yet sold any of it. He denied that the drugs found in the trailer were his but admitted that the drugs recovered from his apartment and from the storage locker associated with his son's apartment were all his. (The record is silent as to any inquiry or statements concerning the marijuana, concerning the identities and activities of the lessor of the

trailer to appellants and of the alleged sublessee, and concerning the extent of appellant's presence at and control of the trailer.)

Moya-Vega said that his source for the drugs was someone he knew only as "Coyote" and met in the street or at McDonalds Restaurant. Moya-Vega initially said he obtained the methamphetamine (as well as the cocaine) from Coyote. Moya-Vega later said the source of the methamphetamine was named Carlos or Andres. Moya-Vega said that the notes which the police believed indicated wire transfers of drug money were written by his wife, but that the amounts (totaling 99,000) indicated Mexican pesos rather than United States dollars. The prosecutor estimated that 99,000 pesos was then equivalent to $11,000. Moya-Vega said he got the money from working and selling drugs. He said, at the sentencing hearing, that he had accumulated the money from the time he arrived in the United States, over a year or a year and a half, and that he had wired it to Mexico later, over a couple months. (The Pre-Sentence Report indicates that Moya-Vega worked a construction job from February, 2002, until August, 2002, making twelve dollars per hour. The record is otherwise silent concerning Moya-Vega's work and income history and the likelihood that appellants could have saved $11,000 without more drug sales than Moya-Vega admitted to. The record indicates no inquiry concerning the details of appellants' income.)

In its letter to the district court concerning Moya-Vega's statements, the government identified no questions it had put to appellant and which he refused to answer, produced no evidence contradicting any statement he had made, and identified no internal contradictions in appellant's account. The prosecutor simply stated that he did not believe appellant's account was truthful and complete. At the sentencing hearing, the government added very little to its conclusory statement in the letter. The prosecutor said he believed the notes indicating wire transfers referred to 99,000 dollars, not 99,000 pesos. The sole evidence the government relied on for this conclusion was that the two wire transfer receipts that were recovered stated

dollar, not peso, amounts. The government said that even if the entries were for pesos, it was "not credible under these circumstances" that appellant could have accumulated the money from his employment and drug sales over a very extended period of time. Additionally, the government said that appellant's statement that he had not yet sold methamphetamine was "just not credible," since appellant had over a pound of it in his apartment.

The district court's consideration of Moya-Vega's statement was brief. The court stated,

> None of this makes any sense to me.
>      . . . .
>      And so, in this case is it possible [that Moya-Vega's statement is truthful and complete]? I'd say one out of a thousand is generous that I'm wrong, I guess so, and if that's the case I take responsibility. But I respectfully deny the safety valve. I believe that whether it's out of fear for yourself or your family or to protect other people, the information isn't coming forward . . . .

Sent. Tr. at 11-12.

The court sentenced Moya-Vega to a term of incarceration of 135 months (11 years and 3 months).

## II.

We review for clear error a district court's finding as to the completeness and truthfulness of a defendant's safety-valve proffer. *See United States v. Romo*, 81 F.3d 84, 86 (8th Cir. 1996). The district court's findings in these cases were based on a credibility determination–on the court's view that the accounts were too improbable

to be believed.[4]  Ordinarily, of course, a trial court's findings as to the credibility of a witness, reviewed for clear error, are virtually irreversible on appeal.  *See United States v. Eis*, 322 F.3d 1023, 1025 (8th Cir. 2003).  A credibility determination based on the improbability of a safety valve proffer, however, presents a special case.

A defendant has the burden to show, through affirmative conduct, that she has made the required statement.  *See United States v. Santana*, 150 F.3d 860, 864 (8th Cir. 1998).  We have affirmed denials of the safety valve benefit to defendants who have failed to make the requisite effort to demonstrate that they have provided the government a full and true statement of their knowledge of the criminal enterprise.  *E.g., id.* at 864 (defendant made no effort); *United States v. Velasquez*, 141 F.3d 1280, 1283 (8th Cir. 1998)(defendant made no effort until the day of sentencing, when he produced an affidavit the trial court believed to be inconsistent with the evidence produced at trial); *Romo*, 81 F.3d at 86 (defendant failed to respond to government requests for specific information).

The appellants in the present cases have met their burden of affirmatively demonstrating that they have told the government what they know of the criminal enterprise at issue.  Each appellant participated in at least one interview with the government, provided an account of their involvement in the offense which addressed all essential points, indicated a willingness to answer all questions, and did so answer. In neither case did the government identify any question it asked that was not answered.  Nothing more can be asked of a defendant to demonstrate the completeness and truthfulness of a safety valve statement than to give as full a statement as the government requests, and that the statement be consistent and that it comport with the evidence.

---

[4]While the district court was able to observe the appellants at their sentencing hearings, the court was not present at the interviews of appellants, nor did the court engage in its own inquiry of appellants with respect to the statements the court found incredible.

This court has held that after a defendant has made a safety valve proffer, if the government disputes the truthfulness or completeness of the defendant's proffer, the government then has the burden to present evidence on the point, and that the adequacy of the proffer cannot be negated by the government's mere conclusory assertion that the proffer is not truthful or complete. *See United States v. Kang*, 143 F.3d 379, 382 (8th Cir. 1998)("Whether defendant truthfully denied involvement with more than 6.84 grams is a question of fact. The government cannot by its mere *ipse dixit* establish that defendant has been untruthful. The issue requires evidence . . . ."). The government did not present evidence that appellants' proffers were incomplete or untruthful. The government merely asserted that they were.

The completeness or truthfulness of a defendant's proffer may be negated by evidence newly presented after the proffer is made, or by evidence otherwise presented (e.g., at trial) or by facts agreed to (e.g., in guilty-plea proceedings). A safety valve proffer may also be found incomplete or untruthful on the basis of internal contradictions within the proffer itself. *See, e.g., Velasquez*, 141 F.3d at 1283; *United States v. Weekly*, 118 F.3d 576, 581 (8th Cir. 1997). In the present cases, appellants' proffers are not contradicted by evidence, nor are they internally inconsistent.

The district court found the appellants' accounts incredible because they are improbable. We agree that both accounts could be considered improbable–Moya-Vega's more so than Alvarado-Rivera's.[5] We hold, however, that this is an inadequate basis for declining to find a defendant's statement truthful and complete for purposes of the safety valve provision of 18 U.S.C. § 3553(f).

---

[5]While improbable, appellants' accounts are certainly not impossible or in the realm of fantasy. Nor is the improbability of the accounts easily assessed here. The record does not reflect a probing inquiry into the statements of appellants and the circumstances and events relevant to appellants' accounts.

The safety valve may remedy the potential disparities in the sentencing of high-level and low-level drug defendants. In general, high-level drug defendants can qualify for substantial assistance reductions because their greater participation in criminal activity resulted in their having more information to offer the government. However, low-level drug defendants often have no new or useful information to trade and thus cannot qualify for substantial assistance departures. Thus, the safety valve allows low-level defendants who meet the criteria to avoid the often harsh statutory minimum sentences. *See United States v. Rojas Madrigal*, 327 F.3d 738, 743 (8th Cir. 2003).[6] The safety valve ought not to be denied solely on the basis of the prosecutor's skepticism, adopted by the district court, where defendant has given a full, internally consistent account, uncontradicted by any evidence. To deny the safety valve in these circumstances would thwart the purpose of the safety valve provision to mitigate, at times, the unduly harsh and often unfair mandatory minimum sentences imposed on first-time offenders.

The rule of preclusion-by-skepticism would frustrate the purposes of the federal sentencing regime more generally, as well. The safety valve is an integral part of that regime, which was enacted to promote uniformity and consistency in sentencing. *See generally* UNITED STATES SENTENCING COMMISSION GUIDELINES MANUAL § 1A.1. To deny the safety valve because of a perceived improbability of

_____

[6]The sentencing judge in these cases expressed his sense, particularly as to Alvarado-Rivera, that the mandatory minimum was excessively harsh:

> [I]n many cases, one just like this, . . . under any set of facts 120 months or this 10-year mandatory minimum is a lot of time and represents — could represent a harsh sentence . . . . Miss Alverado-Rivera [*sic*], I look at you and I see basically a decent woman, someone with no criminal record, someone who I would, frankly, have a better day today if I could leave and give you the 47 months.

Sent. Tr. at 36-37.

a defendant's proffer–perceptions which may vary greatly from prosecutor to prosecutor and judge to judge would introduce a degree of arbitrariness that is inconsistent with the federal sentencing regime.

Denying application of the safety valve because of the possible improbability of a defendant's proffer creates substantive, as well as procedural, arbitrariness and unfairness: The necessary effect of such a denial is to make subjective improbability, rather than untruthfulness, a disqualification for the safety valve. The safety valve provision of § 3553(f) requires a true proffer, not a probable proffer. Denial for a reason not salient under the statute is arbitrary and contrary to the mandate of the statute and is at odds with traditional notions of fairness under the law.

Where the government thinks it has not received the full story from a defendant, it has the power and facilities to prove the inadequacy of the proffer. The government is free to request, and the trial court is free to grant, a continuance to allow investigation of facts asserted in a defendant's proffer. Even the mere threat of contradiction by evidence the defendant is unaware of–a threat made openly during a safety valve proffer, perhaps–is a substantial deterrent to false safety valve proffers. Thorough probing into the details of a defendant's story–which was not conducted here–may also expose falsehoods or material gaps in a story. Substantial and effective safeguards do exist against the wrongful application of the safety valve to defendants who have not given the full and true statement required by 18 U.S.C. § 3553(f). By contrast, there is little to safeguard against the wrongful denial of the safety valve to defendants who have, in fact, given a full and true statement, where without contradictory facts or other indicia of untruthfulness, the government and the judge say "no." The perceived improbability alone is not enough to turn down the safety valve.

III.

Accordingly, for the foregoing reasons, we vacate the sentence of each appellant-defendant and direct that the safety valve provision of 18 U.S.C. § 3553(f) apply to each guideline sentence imposed by the district court.

MURPHY, Circuit Judge, dissenting.

In this case the majority has shifted the safety valve burden of proof to the government in disregard of clear statutory language to the contrary, and I dissent. When Congress created the safety valve to give certain nonviolent drug offenders an opportunity to escape the full force of the mandatory minimum sentencing statutes, it restricted eligibility for this relief to individuals who have "truthfully provided to the Government all information and evidence" they have about their offenses or course of conduct. 18 U.S.C. § 3553(f). The district court carefully considered the safety valve proffers made by the appellants and found they were not credible. In light of the record before the district court, its findings that appellants had not satisfied their burden were not clearly erroneous.

Appellants faced mandatory minimum sentences of 10 years when they pled guilty to conspiracy to distribute and possess with intent to distribute over 500 grams of methamphetamine. Their only hope for a lower sentence was to qualify for the safety valve, for the government had not moved for a substantial assistance departure below the statutory mandatory minimum.

The proffer statements made by appellants must be examined in the context of the government's evidence. This evidence included the very large amount of drugs found in their trailer (27 pounds of methamphetamine), in their apartment (1 pound of methamphetamine of the same unusual doughy consistency and disc shape as that in the trailer, plus cocaine and marijuana), and in the storage locker to which their son

moved drugs from the apartment (281.5 grams of methamphetamine, 43.5 grams of cocaine, and 82.5 grams of marijuana). In addition, $3,875 in cash was hidden in their closet, they had receipts in the apartment for $6,000 wired to Mexico, and notes indicated they had recently made up to $99,000 in wire transfers to Mexico. Despite this evidence, Moya-Vega claimed to have had only one drug customer, who happened to be the informant, and to have sold no other drugs than cocaine. His explanation for the large amount of methamphetamine in the apartment was that his supplier, whom he really did not know, had offered him an opportunity to sell it. That so much methamphetamine would be fronted to an inexperienced dealer could be found both improbable and not credible, and appellants both denied any knowledge of the 27 pounds of similarly distinctive methamphetamine hidden in their trailer.

During Moya-Vega's proffer interview he stated that he had sold cocaine to the informant approximately fifteen times and that he usually sold him half an ounce for a profit of $50 to $100. When it was pointed out that these transactions would not account for the amount of money he attributed to his drug deals, he adjusted his estimate up to two or three transactions every week for six months. Moya-Vega also changed his story about who supplied him with cocaine and methamphetamine, first stating that he did not know the source's name but that he was called Coyote, and then on the morning of his sentencing hearing saying that the source was named Andres or Carlos. After considering all of the evidence implicating Moya-Vega in major drug activity and hearing his very limited admissions, the experienced trial judge stated, "None of this makes any sense to me."

In Alvarado-Rivera's one hour sentencing hearing, the district judge indicated he would prefer to give her a lighter sentence but that he could not because "[t]here's no ring of truth to this." He told Alvarado-Rivera that "I don't believe that you've substantially told the truth." He found her statements not credible, including comments that she had only used the digital scale to weigh a bracelet, that the only money she knew about came from her homemade food sales, and that she had never

- 16 -

used the apartment dishwasher (and was thus unaware of the methamphetamine hidden in it). The court expressed its concern for the integrity of the system and said, "I don't believe that it's even a close call on how I evaluate the record." In summing up his evaluation, the district judge told Alvarado-Rivera, "I have found that you're not eligible for the safety valve because I found that the proffer was not substantially truthful based upon all the record that I have in front of me and the circumstantial inferences."

The district court's safety valve findings can be overturned only if they were clearly erroneous. Romo, 81 F.3d at 86. When the record supports these findings, affirmance is required regardless of which party is favored. See United States v. Tournier, 171 F.3d 645, 647 (8th Cir. 1999). The test is not whether we "agree with the district court's findings of disputed fact," but whether the record supports them. Id. at 648. The standard is no less deferential when the finding concerns credibility. See United States v. O'Dell, 204 F.3d 829, 838 (8th Cir. 2000); United States v. Surratt, 172 F.3d 559, 566 (8th Cir. 1999).

The safety valve provision is an exceptional one, designed to benefit "a narrow class of defendants," H.R. Rep. No. 103-460 (1994), and appellants have the burden of showing affirmatively that they have satisfied the final criterion in the statutory test by giving the government truthful information and evidence. See United States v. Romo, 81 F.3d 84, 85-86 (8th Cir. 1996). The majority purports to acknowledge that the burden belongs to appellants, but it then turns the standard upside down. It departs from governing precedent to require the prosecution not only to produce evidence to establish the offenses of conviction, but also to prove the negative of individual statements in safety valve proffers, no matter how unlikely they might be.[7]

---

[7]The only support cited by the majority for its novel burden shifting approach is United States v. Kang, 143 F.3d 379 (8th Cir. 1998). The central issue there was whether the defendant had stipulated in his plea agreement to the quantity of crack claimed by the government. The court found he had not and remanded for a factual

The transcripts reveal that although the district judge sympathized with appellants, he could not find that they had been truthful. The majority examines the proffers de novo, however, and finds that they were "not contradicted by evidence" even though "improbable" and concludes that they were "an inadequate basis" for withholding safety valve relief. It fails to apply the correct standard of review, and it places a new burden of proof on the government in conflict with the governing statute and the case law.

The judgments should be affirmed because the district court did not clearly err when it found that appellants had not truthfully supplied all information about their offenses and therefore had not satisfied their burden to show they had fulfilled the statutory conditions for obtaining safety valve relief.

_____

finding on quantity, an issue on which the government bore the burden of proof, but it did not shift the safety valve burden to the government.